Well, I've already been introduced. I'm Davina Chan and I represent Gregory Goodwin. I'd like to reserve five minutes for rebuttal. Mr. Goodwin raises three appellate issues. The first is the erroneous denial of his peremptory challenge. The second is the impropriety of certain supervised release conditions. And the third is the unconstitutionality of the statute. He raised the third issue solely to preserve it for Supreme Court review. And with regard to the second issue, I've learned that the supervised release conditions regarding gang paraphernalia has been heard by another panel of this Court last month in the case of U.S. v. Leon Wilson Brown, CA 05-50463. Mr. Goodwin, I think, is that the one out of eastern Washington? Ms. Brown Actually, it was from the same district. Mr. Goodwin Oh, from central California? Ms. Brown Central California. It's the exact same condition. Mr. Goodwin Oh, the exact same condition. Ms. Brown The exact same condition. Mr. Goodwin Okay. All right. Because we're about to issue an opinion, and I cannot remember the name of the case, out of the eastern district of Washington that involves white supremacists instead of gang members. So keep an eye on the... Ms. Brown Eastern district of Washington. Mr. Goodwin Of Washington, yeah. We heard the case last month in Seattle. Ms. Brown Well, apparently it's a well-trodden path, and so today I will use my time to address Mr. Goodwin's first issue, which is the issue of the At trial, he defended on the ground that if he possessed this firearm, or the person who did possess this firearm, was shooting it into the imperial court's housing development. As a lifelong member of that community, a mentor to the youth in that community, and a community activist in that community, he would not shoot into the community. So the defense theory went, whoever was shooting into that community was a rival gang member. In order to obtain a fair hearing on this defense, Mr. Goodwin's attorney sought, to the extent possible, to construct a jury that would be able to hear that machine gun fire was fired into a community, and still have an open mind to believe that it was not Mr. Goodwin, but a rival gang member. In order to do so, he sought to remove from the jury jurors who came from less urban areas, less populated areas, what was called during Vladivostok, low crime rated areas. Whether this court thinks that's a wise strategy or not is not in question. What's the question is, is whether it was legal, and clearly it was legal. Ms. Chen, isn't the issue here whether or not Judge Morrow should have gone to step three on Batson, because the proffered reason is on its face neutral, is it not? Absolutely. Okay, and it seemed to me that she did a pretty good job of going through the three-step Batson process with other challenges, but for some reason she didn't. Absolutely. So the question I have for you is, in light of the decision that she relied on, did she have to go to step three, or could she rely upon that decision and conclude as a matter of law that it was a racially prejudicial reason? And the answer to that is she had to go to step three. Bishop, to the extent that it might have suggested that you could stop at step two because you thought perhaps, for instance in this case, striking people from less populated areas would have a disproportionate impact on white jurors. To the extent that Bishop even suggested that, it's clearly been overruled both by the Supreme Court and by this circuit. The law on equal protection and on Batson specifically is quite clear. In order to find a violation, there must be proof of intentional racial discrimination. A disproportionate impact on a protected group is not enough. In this particular case, it's not. We didn't find in Bishop though, did we not, that because of the fact that Compton had such a high percentage of black residents, that excluding people from Compton must have had a prejudicial basis. Bishop was actually quite complicated because the prosecutor said so many things. But our panel, as I read the opinion, basically concluded that because of the racial makeup of the community, that we could infer as a matter of law that the prosecutor had a race-based reason for wanting to exclude people from Compton. Am I over-reading, Bishop? You know, I've read Bishop so many times in the past week because I'm trying to figure out exactly what was the heart of that opinion. And it seems to me that the prosecutor in Bishop and this court cited to the prosecutor's language, what the prosecutor said was because the juror in that case came from Compton, which was a poor black community, she was likely to believe that police picked on black people. And that was quoted right up at the beginning of Bishop. It was quoted several times throughout Bishop. And it seems to me very relevant to the court's decision in Bishop, that it was not just that she came from a predominantly black community, but that because she came from a predominantly black community, the prosecutor believed that she was likely to sympathize with black people and believe that police picked on black people. But isn't the argument here, at least as I understood the objection at trial before Judge Morrow, that the attempt to exclude people from lighter communities, if I can use that term, Santa Barbara, Palmdale, wherever the veneer came from, was doing just the same but in reverse. In other words, trying to exclude from a case which took place in the heart of, what is it, Watts? Is that where this occurred? Somewhere in South Central Los Angeles? South Central Los Angeles. The defense was attempting to exclude whites from the jury in the hope that they could fill the jury with people more from that community who would somehow identify. Isn't that what they were saying? That's what the government argued. First of all, Palmdale is not a predominantly white community. So right on its face, it doesn't fly. But more importantly, the law is quite clear that just the fact that a person comes from a community that is predominantly white or predominantly black and that you are characterizing them because they come from such a community. Stepping back for a moment, Mr. Ferris did not come from such a community. But assuming for a moment he did come from such a community, that is not enough to show intentional racial discrimination. If it were, it would also be, for instance, we often hear litigants striking people because of their profession. For instance, a doctor. I don't want a doctor on my jury. I don't want a lawyer on my jury. Clearly, statistics are going to show that these professions, the legal profession, doctors are also predominantly white. And yet there's never been a case, and I can't believe there ever will be a case that says that because striking someone based on their profession has a disproportionate impact on white people, for instance. But that's different. I mean, essentially what we said in Bishop is that residence was being used as a proxy or a subterfuge for race. I think that in Bishop, the court said proxy and not subterfuge. And I think that is significant. Is there a difference? I think it is different because proxy, I believe, goes to the second step. If you use race as a, if you use residence as a proxy for race, then the explanation you're giving is not race neutral. If you're using it for a subterfuge for race. Well, that leads back to the question that I asked you. Because it appeared to me that Judge Morrow essentially responded to the prosecutor's citation to Bishop by concluding, in essence, conflating step three into step two in reliance on the Ninth Circuit's decision in Bishop that residence was being used as a proxy for racial discrimination. And apparently she decided she didn't need to go to step three. Is that a fair reading of the record? It is a fair reading of the record. But we have to understand, then, that that portion of Bishop has been overruled. When we use proxy, I think, the reason I'm making this distinction between proxy and subterfuge is I think the government makes it. And they're brief. They talk about, if it's at step two, it's proxy. If it's at step three, it's subterfuge or pretext. Well, clearly, had she gone to step three and said, I find that this is really, use whatever descriptor you want, but I find this is racially based, and it's being done by tying the residence of the veneer person to racial discrimination, you wouldn't have any argument before us on that. I would have no argument before you. But as Your Honor made clear with your initial comments, this particular judge was very careful. She told us what she was doing. When she meant to rule at step three, she said so. She said, I believe that that explanation is not credible. She wasn't afraid to tell the prosecutor when he attempted to strike, I think it was Ms. Howard, that I find your explanation not credible. And then she backed it up. She explained why she found it to be not credible. She explained that he had only voir dired black women, that he had mischaracterized her responses to voir dire questions. So this wasn't a judge that was kind of loosey-goosey with her steps. When she meant to rule on step one, she was quite clear. She said, I find that that does not give rise to an inference of racial discrimination, and therefore you haven't made out a prima facie case. When she wanted to rule on step three, she was quite clear. She said, I find the defense explanation to be credible. I find the prosecutor has not borne his burden of proving racial discrimination. In fact, I don't think I've ever read a record that was quite so clear. But the only difference is she had a case. And that case can be read to suggest that where the peremptory challenge is being employed as, use proxy if you will, for a racially discriminatory purpose, that that constitutes a violation of BASC. But the way the government characterized Bishop in the district court is quite different from the way it characterized Bishop here. She did not take a break. She didn't go read Bishop. She didn't shepherdize Bishop. And in fact, if she had shepherdized Bishop, it wouldn't have helped because the case from the Ninth Circuit that noted that Bishop had been partially overruled. We hear complaints all the time from district judges that we appellate judges don't appreciate the fact that they have to make these rulings on the fly. Absolutely. They can't take a two-week recess until they have their law clerk's research. Absolutely. And I'm not saying she should have. What I'm saying is that she did, she relied on the government. Well, I don't agree with that. I think district judges need to keep up with the law. And I know I did. I had a big notebook. And I went through the slip sheets and I'd make notes on it because I knew that I had to be on top of this. Maybe life's more complicated now. Well, actually, Your Honor, Boyd v. Brown, which is the case which said that Bishop was partially overruled, it postdated Mr. Goodwin's trial. So although the government says that Bishop was clearly overruled or partially clearly overruled by Perkins, this court didn't recognize that until 2005 after Mr. Goodwin's trial. In fact, I found a case as late as 1999, and that's Stubbs v. Gomez, where this court cited Bishop for the same proposition that the government cited Bishop for, that if you use residence in a way that isn't really tied to the facts of the case, that that could be not a race-neutral explanation. Excuse me. Go ahead. Finish your sentence and I'll ask you my question. I'm not saying that the prosecutor mischaracterized the case on purpose. But the prosecutor did mischaracterize the case. He did say that Bishop stands for the proposition that if you're striking someone because he's too far from this or from a predominantly white area, that is not race-neutral. And for whatever reason, the judge didn't get to step three, as Judge Tauman has asked you, and you agree, we all agree to that. I agree. Why does that require an automatic reversal? Why shouldn't we say, okay, under the circumstances, we'll remand it for a hearing, and Judge Morrow, go hold a hearing and finish what you were supposed to do? If you find that there was a discriminatory purpose at step three, then no harm, no foul. On the other hand, if you believe the prosecutor now, in light of the cases that have been developed, that this wasn't a race proxy, this was for urban versus country bumpkins, you know, nothing to do with race, then we have a different situation. Why is this an automatic reversal case? Well, the only reason I would say this is an automatic reversal case is because that appears to be the law of the circuit. In Anagoni, the only finding that the district court made was he's Asian. The district court did not make a finding that the defense attorney's explanation was pretextual or lacked credibility or anything like that. He just said he's Asian and left the juror on the jury. And this Court held that the remedy was automatic reversal. That having been said, I don't think in Anagoni that the Court actually addressed the issue of whether there could be a remand for the district court to actually get to step three. And so Mr. Goodwin would not be averse to a remand for Judge Morrow to conduct the step three analysis. That is, to find whether Mr. Diaz, Mr. Goodwin's attorney, was engaging in intentional racial discrimination. What I would object to is — If the hearing says, no, there's no racial — there was no improper purpose for this challenge, then she would have to give him a new trial. She would have to give him a new trial. And another circumstance in which I would argue she would have to give him a new trial is if she said, you know what, it's kind of too late for me to figure it out at this point. I can't decide right now what Mr. Diaz's motivation was last year when he did this. My argument then would — she would also have to argue a new trial. There's a Second Circuit case which is cited in one of the cases that the government cited. I have the site here if the court wants it, in which the court says exactly that. Remand it for the judge to make a third-level finding. If the judge finds that the passage of time makes it impossible to divine the — in that case it was the prosecutor's motivation, then they should order a new trial. And that case is U.S. v. Alvarado, 923 F. 2nd, 253, Second Circuit case from 1991. It's one of the cases collected in U.S. Express Enterprises, which the government cited as collecting cases. So it didn't actually make it into the briefs. It was sort of referred to in the briefs. Alvarado was at the — U.S. v. Alvarado. If the court doesn't have any further questions, I'd like to present the remainder of my time. Good morning. May it please the Court. Becky Walker for the United States. The court in this case necessarily and correctly found that the defense attorney had engaged in purposeful race discrimination in striking this white juror. In this case, the judge exercised some healthy skepticism with respect to both parties' racial motivations. This was a racially charged case. It involved police conduct of African Americans in South Los Angeles. The defense specifically wanted that issue. Before the jury, earlier on in the day, the court had addressed that issue with respect to evidence of the police's treatment of individuals in the imperial court's neighborhood. The court had correctly excluded evidence of that general conduct. But that was clearly an issue that the defense was interested in and had been an issue. There had also been issues about evidence coming in regarding the Rampart investigation, other issues that highlighted the racial tension in Los Angeles. So race was permeating this trial by the time we got here. And, in fact, the bats and challenges were flying in this case back and forth. The court in this case sustained some of those challenges, rejected others, but in every case carefully considered those challenges and reached a determination whether the strikes were, in fact, reflective of purposeful race discrimination. Ms. Walker, the one thing she didn't do was go to step three, and she clearly knew how to do it. The transcript is replete with regard to other challenges where she did exactly what our law appears to require. Right. And she did not expressly do so with respect to this particular challenge. What I think the other challenges do reflect is that she certainly did understand the framework as a general matter. No question about it. That's how I read the transcript, too, which makes it all the more glaring, maybe too strong a word, but all the more significant that in this particular case she didn't. How can we overcome what appears to be a violation of our case law? Well, first of all, it's really not clear. I mean, she never specified that she was ruling on the basis of step two, step three. That just wasn't discussed, and it probably wasn't discussed because Boyd had not come out at that time. There wasn't a question about the validity of Bishop with respect to step two versus step three analysis. Nobody really was considering that issue. She never said whether it was step two or step three. We're assuming she didn't make it. It's a Batson challenge, and it's Batson that requires the three-step analysis, doesn't it? Right, but I think what had not come into question yet was whether Bishop's analysis was somehow contrary to Perkett or had somehow conflated, you know, Bishop itself had somehow conflated steps two and three. That issue had never, had not come to light at that point. So when the parties were talking, when the government and the court were discussing Bishop, neither one would have necessarily had reason to think about whether it had been overruled or at least would have had that issue obviously before it. The judge seemed to think that just the mention of any kind of geographic reason had to kind of translate into a race reason. Well, that might be one reason. And partly she did that at the government's urging. Well, I think, unfortunately, the government was a little inartful in the way that it described Bishop without a doubt. And, you know, in a shortcut, again, we're standing at, you know, sidebar.  That could be certainly read that way. However, the actual assumption that was being discussed was Bishop. The government dropped the ball when explaining the importance of Bishop to the judge. Did the government drop the ball? Was that the court's question? Well, I think the court was, the government was certainly less than precise in how it described Bishop. But the assumption that I think the prosecutor was trying to get at, and which is the assumption in Bishop, and I also think that we should assume the court properly understood case law, including Bishop, and probably was familiar with Bishop. This is actually a very careful judge. But certainly read that transcript as sort of a lawyer and judge's shorthand. Shorthand, exactly. By citing to Bishop without having to go into these were the facts and this is the holding and this is what the Ninth Circuit said that you have to do. We're in the middle of jury selection here. We're not making an appellate argument. Right. I think that's exactly right. And I think this judge, if she had had a question about what Bishop actually held, I don't think this judge would have just taken the government's word for it without looking at the case. She could have certainly called a recess, come back to the issue, and taken a look at the case. But she didn't really reflect probably that she was familiar with the case. Does she know where this juror lived, where the juror was from? Well, it's not clear whether she had remembered correctly, which is based on the transcript, that he was from Palmdale. From Santa Barbara? I'm sorry? You thought the juror was from Santa Barbara? Well, the government in its explanation said that the juror was from either San Luis Obispo or Santa Barbara. That was actually wrong. Say that again. The government said that it referred to the fact that this juror was from San Luis Obispo or Santa Barbara, those areas. In fact, the juror was from Palmdale. He had said earlier in Vardeer, and it's unclear why the government made that mistake. But the government did. And then defense, the defense attorney, picked up on it and said it and acknowledged that the juror was from San Luis Obispo, ultimately, when he came back and said that was the reason. They were all wrong. The parties were wrong. The court never commented as to whether the juror was from San Luis Obispo or Palmdale. I mean, the fact that, I mean, it's entirely possible that the court was aware that the juror was, in fact, from Palmdale and factored that into the believability of the explanation. If the reason for it was something about the rural nature. It's a pretty diverse area. It is. And so is Santa Barbara. Right. Well, I think that the representation made and I don't know the demographics precisely of Santa Barbara. The representation of that would be a predominantly white area. Certainly the representation regarding San Luis Obispo. And I'm pretty sure it would be borne out is that it's a predominantly white area. Palmdale was racially diverse. But the bottom line is that nobody was talking about Palmdale. The explanation had to do with San Luis Obispo, which everyone did seem to agree was a predominantly white area. And the fact that whether the defense attorney was right or wrong about that, that was what he stated. And that was apparently his mindset. Or, in fact, he was wrong. And the fact that he was wrong about it, maybe even knew that he was wrong about it, could have certainly factored into the judge's assessment of his explanation. And if San Luis Obispo, say the rural nature of San Luis Obispo, something not race related, but maybe its rural nature had really been the concern, then you'd think that he would have known. In fact, if this juror was not from San Luis Obispo, he would have focused on that issue. But to get back to Judge Silverman's question, I mean, it's either the country bumpkin versus the sophisticated urban dweller who goes to bed each night with the sound of gunfire ringing in his ears. Or it is, as I think I read the transcript to be, an argument by the AUSA that this is a proper Batson challenge because what this really is is a proxy for a race-based peremptory exclusion. The problem is that the judge never said that, and so we don't really know. On the one hand, it could very well be a tactical move on the part of the defense to keep rural people who may not be quite as empathetic to what life is like in the inner city off the jury. And that's not necessarily a racially based reason to bounce somebody from a jury. Right. But that is not what the district court found. I mean, what the district court found was that it fell within the parameters of Bishop. I can't hear you clearly. Okay. I'm sorry. I'll try to speak up a little louder. What the court found was that this fell within the parameters of Bishop. Again, this is a shorthand. It leaves us with a little uncertainty as to what that means, without a doubt. But what the parameters are of Bishop, if we look at what Bishop actually holds, it deals with the assumption that in that case that a black juror living in a predominantly black neighborhood would have a certain attitude about the police's treatment of blacks in that neighborhood. And the court in Bishop held clearly that that's pernicious. Yeah, but it would have a certain attitude about what? The police's treatment of blacks in that neighborhood. And the court held that that stereotype was not permissible under Batson and his progeny. In fact, that is the very sort of stereotype that is prohibited by Batson, that necessarily that reflects sympathy, a sympathy that a black juror will be more sympathetic to a black defendant. And that is really what's underlying that assumption, this assumption. I think this is the false assumption. Because if you have people who are living in an area where gangs are all over the place, and they serve as jurors, they're the victims. They're the ones whose kids are getting shot and bullets are flying. And so I'm not so sure that this business of keeping black people off the jury is really a very good reason for doing this. That may well be true. That's been my experience. That very well may be the case. If you're living in South Central and you're working hard, and you're worried about your kids and you're worried about the dangers, and say you're a black person and you're called as a juror, you're the victim, you know. Right. No, I think that may very well be the case. You're not out there defending the gangs by any means. Right. Be that as it may, whether it's true or not, or whether it's a good reason or not for striking a juror, what this Court has held, even if it were true, even if that sympathy were in fact true, that's not an assumption or a stereotype that we are willing to permit. And I think that that is really the parameters of BISHOP. And what BISHOP stands for is the proposition that you can't do that. You can't make that assumption. What the prosecutor here was pointing out was that the defense attorney was doing exactly the same thing in reverse. Well, there is language in BISHOP in which we say where residence is utilized as a surrogate for racial stereotypes, as, for instance, a shorthand for insensitivity to violence, its invocation runs afoul of the guarantees of equal protection. I mean, if that's what Judge Morrow had in mind when she cited Batson, then her striking or sustaining the objection was proper under that language in BISHOP. Right. And I think if we look at what you have to have valid, you'd have to have more information to do that. I mean, she didn't have the correct information. Well. I mean, this person was from Palmdale. You know, that's a different area than San Luis Obispo. Well, maybe. But I think. It is. No, no, it is. I've lived in this area all my life, so I have some idea what's going on. Now, I don't mean to say that Palmdale is not different from San Luis Obispo. I think that ultimately what the court was doing was not making a demographic analysis of Palmdale versus San Luis Obispo, since, of course, that never even became an issue. But rather the court was looking at whether this defense attorney was, in fact, making a race-based strike. That was the ultimate determination. Whether that happens at step two or step three, that is always the ultimate question. Yeah, but that would be based on the area where this prospective juror lived. Well, not necessarily. And we didn't even know that. Well, not necessarily. It really comes down to what was the intent of the defense attorney. And it really comes down to his mindset and the assumptions that he was making. And what I think the court was actually saying, and what the government was pointing to in a shorthanded way, is that the assumption being made here is that a white juror from a predominantly white neighborhood is going to make certain assumptions, not be sympathetic to an argument about mistreatment of blacks in south L.A. And that's exactly the flip side. That's the exact mirror image of Bishop and the assumption that the court in Bishop held was improper. That was really the point that the prosecutor was trying to get across, and I think that's really the point that the court ultimately accepted. So whether the court, you know, could have been more clear, of course the court could have been more clear. I don't know if you're making that assumption. You really have to know where this person comes from. You probably have to have some evidence in the record that tells you the composition of the neighborhood and all that. Otherwise it's just pure speculation. It's just pure speculation. Right. I think if we were talking about maybe a broad proposition that the demographic of a particular demographic of the juror, necessarily if you're striking someone from that demographic, you're striking them because of race. I don't think we certainly aren't now, and I don't think we intended to at trial, suggest that that is necessarily and always the case. In Bishop itself it recognized, the court recognized that it's not the case that residents can never be race neutral. In fact, it pointed out examples where residents might have a valid relationship to the case. It would not be, it would not in fact be a race-based challenge. Let me ask you this, a follow-up on what I asked Ms. Chen. Suppose we find that Judge Morrow blew this basically. What are our options here? It looks like Anagoni suggests that when there is a wrongful denial of a defense peremptory strike, there's an automatic reversal. Well, what Anagoni holds is that harmless error analysis does not apply, and we would not contend otherwise in this case. So you can't look at it and say, well, okay, even though this juror shouldn't have been struck, you can still affirm because the evidence was strong. That analysis is foreclosed by Anagoni, clearly. But what Anagoni does not foreclose, and many other cases have in fact contemplated and done, including the Batson itself, is a remand for further proceedings on the issue of the Batson challenge. And I think that would be entirely appropriate here. If this court is concerned that the court, the district court, may have improperly not made it to the third step, well then clearly the proper remedy is to send it back to the district court to allow her to go to the third step. If that was the error, if she did not, if she didn't engage in the proper analysis and the court believes that that, you know, that may affect the outcome, the proper outcome of the Batson challenge, then certainly this court can and should send it back to the district court for the limited purpose of allowing her to reanalyze the Batson challenge in light of Perkett versus Elam, in light of the fact that you only look at the race neutrality, at the race neutrality of the reason at step two. So that would, I think that would be the proper remedy. Now I would contend that I don't, I don't think that this court has to do that on this record because necessarily the court made the same determination. Whether it was at step two or step three, the court did ultimately have to conclude and did conclude that this strike was in fact race based. And I do think that the best reading of the record and the assumption that the court understands the case law is that the court was saying what really was going on here, whether stated or not, was that the defense attorney was striking this juror based on the assumption that a white juror from a predominantly white area would in fact have an assumption, would not be sufficiently skeptical in the defense attorney's mind of police conduct of blacks in L.A., the exact mirror image of the assumption held improper in Bishop. And I think because the court necessarily had to find that, that whether you, whether that ends up being a pretext, whether it is analyzed as pretext or proxy, ultimately the conclusion is the same. And for that reason, I would say that this court does not need to remand, but certainly if the court believes that it needs further clarification from the judge to ensure that she did go through the proper analysis, then the appropriate remedy is to remand for that finding. Let me ask you this. The government files a trial brief, right? Yes. I don't know for sure they did in this case. We normally do. And did that trial brief bring the court up to date on Batson? You know, I would have to check it to be sure. I would doubt that it did,  because I don't think we normally would address Batson generally in a trial brief. It comes up in a lot of these trials, doesn't it? It does. Maybe we should include it in our trial memos. Yeah, but that's part of your job. It's part of the U.S. attorney's job to cover the bases sometimes. Well, there are certain. Your Honor, the government suggests that the court may wish to go to step three. Well, I don't think it. You do that to me all the time. Okay, thanks. Well, that's certainly something we could address in a trial memo. I think that it would have been difficult to anticipate, though. That second, you'll only find that there was only one time I was ever reversed by the Ninth Circuit. Is that right? Well, that's an impressive record. How about at the Supreme Court reports? Well, I'll tell you this. I'll tell you this. Every time I've been reversed by the Supreme Court, I've been affirmed by the Harvard Law Review. Understood, Your Honor. Yeah, so it's a—anyway, I had another joke, but I forgot. Anyway. If the court has a— It's a—well, my computer's rebooting now. Well, if the court has a— Oh, I know what to say. Today is December the 7th. Do you know why this is an important date? Well, the anniversary of Pearl Harbor, maybe. Yeah, and December 7th was Marx, the— What year is this now? This is 2006. Yeah, okay. It marks the 29th anniversary of my being sworn into the Ninth Circuit. Wow. Wow. Well, congratulations. We'll all bow our heads in silence. Congratulations, Your Honor. I would have liked another date, but I can't be greedy. I see my time is up. The Court has no further questions. Thank you very much. Thank you. Thank you. Thanks. Just briefly. The government has come in and said the court below must necessarily have found and must necessarily have thought and must necessarily have concluded, but the record doesn't bear that out. The government's argument is based on what we now think that we understand Bishop to mean, meaning what we now think after we've received all this briefing and after there have been numerous Supreme Court and— Well, suppose she was referring to that passage that I read to Ms. Walker, right out of the Bishop opinion. Suppose that was—suppose she'd read it just before jury selection and it was fresh in her mind. If she had—if that had happened and if the record showed that that had happened, I would agree that I lose. But, Ms. Chen, you know, we frequently see lawyers and judges refer to case citations in the course of arguing in court without getting into a detailed recitation of what the case stands for. It's enough to—for purposes of preserving the fact that you considered the case to put the case citation in the record, and the district court asked the prosecutor to give the citation for the record. Absolutely. We often do that. We often say Miranda this or a number of cases. But in this case, the government didn't just say Bishop. The government characterized Bishop, and the government characterized Bishop as standing for the proposition that if you strike someone from a predominantly white area, that that is not race neutral. Even in its appellate brief, the government comes up with three different readings of Bishop. They say there's one reading of Bishop, is that if the geographic explanation is explicitly tied to race. So, for instance, in Bishop, when the prosecutor said she's a black woman from a black neighborhood, and she's more likely to believe that police pick on black people. If the geographic explanation is specifically and explicitly tied to race, that is not race neutral at step two. That is clearly one reading of Bishop. Well, that was the argument that the prosecutor made right after citing to Bishop was the argument that Ms. Walker made, that this was the mirror. This is simply the argument in reverse. Those are his words. Citing to Bishop and then going on talking about the fact that the Ninth Circuit believes this was a proxy for race. Your Honor, he never did actually quote that portion about black people in a black neighborhood who are likely to believe that the police believe in black, pick on black people. What he said was anesthetized to violence. Okay? Which we had found to be, in essence, the pernicious discrimination. Not race neutral at step two. Bishop was quite clear that it was about step two. It says the crux of this case is whether it's race neutral at step two.  But right now it's quite clear that if Mr. Diaz came in and said not anesthetized to violence, like hasn't seen enough violence, that that would pass step two. Everyone in Bishop itself and in the courtroom that day was talking about step two. To assume that Judge Morrow somehow got to step two. In essence, what Bishop is saying is if it's a proxy for racial discrimination, then that is the step three determination, is it not? That this is an improper race-based reason. Generally speaking. Even though it looks facially neutral, it isn't. That's what we're saying in Bishop. Right. And at step three. Right? I mean, you could read it to say when the prosecutor in Bishop explained why he was striking the jurors from Compton and offered what he thought was a neutral reason, that we declare as a matter of law in Bishop that it's not. I think that if the prosecutor in Bishop had said anesthetized to violence, which the prosecutor in Bishop did not say. That was the government's appellate argument in Bishop. If the prosecutor had said anesthetized to violence, and this court held that that's a racial proxy at step two, that would have been error. The law is clear. At step two, it needs to be facially race-neutral. If, and we're reading, it's a reading of Bishop that I'm not sure it exists, but if this court had said anesthetized to violence is not race-neutral, that would have been erroneous. Step two requires only a facially race-neutral explanation. In this particular case, Mr. Diaz gave a facially race-neutral explanation. And it is significant, I think, that every juror he struck was from this kind of rural area, including the jurors of color. Mr. Orteza was from Santa Maria. Ms. Peterson, who the record reflects may have been Latina, was from Port Hueneme. Mr. Diaz was striking men and women, people of color or whites that were from more rural, less populated areas. He didn't want intercity. He wanted all intercity juries. That was his. Well, that would have been impossible. What he wanted was people who might have heard about things that happened in L.A., for instance, who might every so often hear gunshot, gunshot fire. And that probably is okay. There's nothing racially discriminatory about trying to select a juror that would be open-minded to the defense that he was going to present. And in this particular case, that's the explanation he gave. And that was enough. There's been no finding that it was insincere, pretextual, or incredible. And those are the key words. Those are the trigger words for our Step 3 findings. So if the Court has no further questions. Thank you. Well, what about this? You know, if you're going to decide whether something is a proxy for race discrimination, I would think you'd have to know something about this neighborhood where the person came from. And it's kind of interesting from the record. I mean, I suppose the Court could take judicial notice that routinely in the Central District of California, when you walk into court on jury selection day, they give you a list. And that list has the names of all the jurors. And it has where they live. So it's probably likely that Mr. Diaz, at one point, or at least the moment that he sought to strike Mr. Ferris, knew that Mr. Ferris was from Palmdale, or at some point in the process he knew he was from Palmdale. He picked up on the San Luis Obispo thing probably for two reasons. One, the government said San Luis Obispo. The government didn't just say San Luis Obispo. The government said Santa Barbara and San Luis Obispo, areas which are predominantly white. And that is the way that the government characterized those areas, predominantly white. You can't just strike someone from a predominantly white area and call it race neutral, is what he said. And then Mr. Diaz, unfortunately, picked up on it. And he says it's just that it's San Luis Obispo. I'm not sure if Mr. Diaz was saying, I think Mr. Ferris is from San Luis Obispo. I think it's more likely that Mr. Diaz was referring to what happened during Vladimir. And what happened during Vladimir is one juror, Mr. Gorder, was from San Luis Obispo. And Mr. Diaz talked to Mr. Gorder about what's it like in San Luis Obispo. Do you hear gunshots? Is it a high crime rated area? And so for Mr. Diaz, San Luis Obispo was shorthand for kind of rural, not familiar with an urban environment. I think it's much more likely that when Mr. Diaz said San Luis Obispo, that's what he meant. What we know now is that Mr. Ferris was from Palmdale, a racially diverse and still somewhat less populated area. This confirms that Mr. Diaz was not exercising a race-based strike. He struck someone, in keeping with his theory, that was from a more rural or less populated area. It happens to be a very racially diverse rural area. Similarly, he struck Mr. Orteza and Ms. Peterson from racially diverse, less populated areas. So if you do a kind of a comparative jury analysis in reverse, what we find is that Mr. Diaz had a theory. And he used his theory consistently. Mr. Ferris was one of the ten jurors that Mr. Diaz struck that were from relatively less populated areas. It was not race-based. He should have been allowed to strike the juror. The juror should not have been allowed to sit. And that's why either a remand or a new trial is necessary. I was going to ask you that. On voir dire, who conducted the voir dire? The judge? Did the judge allow the attorneys to do that? The judge conducted most of the voir dire based on a questionnaire that included questions that the attorneys proposed. The juries were each allowed 15 minutes of voir dire. And the entire attorney-conducted voir dire picks up only 15 pages of the transcript. Again, in the central district, attorneys are not often allowed attorney-conducted voir dire. They're not very good at it. They don't ask very many questions. In this particular case, Mr. Diaz kept on going back to the first juror. I think maybe it made him feel comfortable to keep asking the first juror questions. But he pretty much only spoke to the first juror. I think he spoke to two other jurors. He did ask kind of general questions like, does anybody live here in a community that is high crime rated? And one of the jurors responded, well, what do you mean by that? And he said, well, where it wouldn't be uncommon to hear gunshots. So we know that Mr. Diaz was looking for people who, you know, whether he was looking to kick people who weren't familiar with gunshots or if he was specifically looking for people who would hear gunshots, it's really the same thing. He was looking for people who would be more familiar with an urban environment. It turned out that no one answered his question. No one said they lived in such a neighborhood. So then he went through residents, and he went through his familiarity with the Southern California area and which areas are less populated, and Mr. Ferris happened to be from one of those areas. And when they talked about Santa Barbara and San Luis Obispo, the U.S. attorney, the assistant, had the list of where the jurors lived, and so did the judge. Everybody gets a copy of it. Everybody gets a copy. Whether they had it in their hands at the time, I don't know, because usually it's done at sidebar, and most attorneys, you know, will only bring their jury chart up as opposed to the long list. So whether they had it in their hands at the moment they were at sidebar, I don't know. But we do know, because of the fact that Mr. Diaz wanted to strike him, that whatever his strategy was, he equated, if he wasn't confused about where the juror was from, he equated Palmdale with Santa Barbara, right? Or he equated Palmdale with a less populated area. A less populated area. So it really doesn't matter whether he mixed up whether he lived in Santa Barbara or Palmdale. He didn't live in an urban environment with a lot of experience, which was the kind of juror that Diaz was. Well, he'd like to move to Santa Barbara. Thank you very much. Okay. Thanks. I'll just take number two, if you don't mind. I left my file number one in my chambers. This one. Urzula. Urzula.  Urzula. Urzula. Urzula. Urzula. Yeah. Urzula versus Gonzalez. We'll take that. Okay. Good morning, Your Honors. Good morning.             Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye.                Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye. Aye.
judges: Pregerson, Silverman, Tallman